(No. 11394.—Judgment affirmed.)

CARRIE M. DUBACH, Appellee, *vs.* EDWARD EVERETT JOLLY. *et al.* Appellants.

*Opinion filed June 21, 1917—Rehearing denied October 5, 1917.*

1. WILLS—*object of statute requiring witnesses to subscribe a will in the presence of testator.* The object of the statute in requiring that a will shall be signed by the testator or acknowledged by him to be his will in the presence of witnesses, and that said witnesses must subscribe their names as witnesses thereto in his presence, is to make sure that the genuine will executed by the testator is the same one that is witnessed and that some other writing is not substituted in place of it.

2. SAME—*attesting witnesses need not be personally requested by the testator to sign the will.* Where it is not disputed that the testator desired to make a will and wanted it attested by witnesses, it is not necessary that the attesting witnesses be personally requested to act by the testator's own words but they may be brought in by a third party to act as witnesses, and the testator's assent will be inferred where they sign in his presence without any objection by him and with his knowledge as to what they are doing.

3. SAME—*formal attestation clause is entitled to weight as evidence.* A will, to be valid under the statute, must be signed by the testator in the presence of the subscribing witnesses or he must acknowledge it to be his act and deed, but an attestation clause in due form signed by the witnesses is entitled to weight, even though the witnesses have forgotten the circumstances or the facts set out in the attestation clause or subsequently testify differently.

4. SAME—*when will is attested in presence of testator.* A will must be regarded as signed by the witnesses in the presence of the testator where the evidence shows they signed the will near the head of the cot on which the testator was lying, that they were within a few feet of him, with nothing to obstruct his view of them, and that he knew what they were doing.

APPEAL from the Circuit Court of Cook county; the Hon. DAVID F. MATCHETT, Judge, presiding.

FOSTER, PAINE, REYNOLDS & BRYANT, for appellants.

STEDMAN & SOELKE, (SWAN M. JOHNSON, of counsel,) for appellee.

Mr. JUSTICE CRAIG delivered the opinion of the court:

George W. Jolly died testate March 12, 1915, in Mercy Hospital, in the city of Chicago, leaving no widow or children or descendants of children him surviving, and leaving as his only heirs-at-law his brothers and certain nephews and a niece, the appellants. His will purports to have been executed on March 8, 1915. He left twenty acres of land in the State of Arkansas and some money and personal property, amounting in all to about $5000. He was a rail-road man about fifty years of age, and had been an inmate of said hospital for about two months prior to his death, afflicted with cancer of the tongue, and the disease had spread until part of the tongue had been eaten away and the soft parts of the neck, jaw and teeth, and the tissues of the throat and the larynx were involved. For a week before his death he was confined to his bed in the hospital suffering great pain and was under the influence of morphine and other opiates most of the time. His wife, who was also an invalid, died on March 7 at the home of appellee, her sister, Carrie M. Dubach, who had cared for her during her last illness. The will, after directing the payment of debts and funeral expenses, devised and bequeathed the sum of $1000 and the household goods and effects of the testator to Carrie M. Dubach, who was also appointed executrix. The twenty acres of land in the State of Arkansas were given to Nathan A. Marshall, a brother of the testator's wife. Everett Jolly, Alfred Jolly, Frank Jolly, Vernon Jolly, Hattie Daniey, Joseph Marshall, John Marshall, Nathan A. Marshall and Carrie M. Dubach were to share equally in the remainder. The sum of one dollar was bequeathed to each of the following: Ernie Wright, Joseph Wright, Hattie Wright, Orlie Wright and Edward Daniey. Those mentioned as beneficiaries in the remainder were the brothers and sister of the testator and the brothers and sister of his deceased wife, including Carrie M. Dubach and Nathan A. Marshall. The will was offered by appel-

lee, as executrix thereof, for probate in the probate court
of Cook county. The appellants, as heirs-at-law of the tes-
tator, resisted the admission of the will to probate, and
after a hearing the court denied probate of the will on the
ground that it was not executed as required by statute. The
proponent of the will, Carrie M. Dubach, appealed to the
circuit court of Cook county, where a hearing was had and
judgment entered admitting the will to probate. This ap-
peal followed, and was allowed to this court for the rea-
son that a freehold interest in real estate was involved.

The witnesses to the will were three railroad men who
were also inmates of the hospital at the time and who were
acquaintances of the testator, namely, Walter W. Reyburn,
Vincent L. Kelley and Albert Cunningham, and they were
the only witnesses heard in the probate court upon the ap-
plication to admit the will to probate. At the hearing on
the appeal to the circuit court the court heard the testimony
of other witnesses in addition to the witnesses to the will,
both on the question of its due execution and the testa-
mentary capacity of the testator at the time the will was
made. It was proper for the circuit court to hear any evi-
dence on behalf of the party seeking probate of the will to
support the same which would be competent to establish a
will in chancery. (Hurd's Stat. 1916, chap. 148, sec. 13.)

It is argued by appellee that the court improperly heard
evidence in behalf of the contestants, other than the wit-
nesses to the will, as to the mental competency of the testa-
tor, but it is not necessary to pass on that point as appellee
has not assigned cross-errors on such action of the court.

It is assigned as error that the trial court erred in find-
ing that the writing propounded was the last will and testa-
ment of George W. Jolly, deceased, and it is contended that
the evidence is not sufficient to establish the due execution
of the will, first, because the testator at the time of the exe-
cution of the writing in question was not competent to exe-
cute a will; and second, that the will was not properly wit-

nessed, in that the witnesses did not subscribe their names as witnesses to the will in the presence of the testator, did not subscribe the will as witnesses at his request, and he did not sign the will in their presence or acknowledge the alleged will to be his act.'

On the day the purported will was drawn and executed the husband of the appellee, who was a lieutenant of police in the city of Chicago, procured from Joseph Fienberg a blank form of will, and asked Fienberg, who was in the dry goods business on Cottage Grove avenue and who was a notary public, to come to the hospital later in the day. Pursuant to such request Fienberg in the afternoon went to the hospital. The testator was an inmate of ward "C," which was a room about seventy-five or eighty feet long north and south and about thirty-five or forty feet wide east and west. The ward contained a row of cots on each side, some of which were occupied by patients, and was well lighted from windows in the east and west walls. The testator occupied a cot in the northwest corner of the ward, the cot extending east and west about four feet from the north wall, the head of the cot being about three and one-half feet from the west wall. There was a window in the west wall near the head of the cot, and a screen about six feet high extended along the north side of the cot and close to it and along the east side and foot of the cot, and from there in a southwesterly direction between the cot occupied by the testator and a cot some feet south of it and occupied by a patient named Evans. There was a table and a chair on the south side of the testator's cot, near its head. The entrance to this ward was from the south. When Fienberg arrived at the hospital pursuant to the request of appellee's husband he entered the ward and walked up between the two rows of cots to the one occupied by the testator. Appellee and her husband were there, the latter seated at the table near the cot. The testator, owing to the ravages of the disease with which he was afflicted, was unable to talk

or articulate distinctly and could say only a few words.
The manner in which the will was made was as follows:
The testator was propped up in his cot and wrote with a
pencil on a tablet and handed the writing to Dubach, who
read it and then wrote on the form of will which he had
procured from Fienberg and which was on the table, and
then handed what he had written to the testator. The tes-
tator then wrote another sheet of paper on the tablet and
handed it to Dubach, who wrote that in the will and again
handed it to the testator to read what he had written. This
was done several times until the will was completed, when
it was handed to the testator, and he read it over, as tes-
tified by Fienberg, several times and signed it. The situ-
ation of the testator and his writing on the tablet and sign-
ing the will were also testified to by Evans. The sister of
charity who was in charge of the ward was requested by
some of those present to get somebody to act as witnesses
to the will. Walter W. Reyburn, Vincent L. Kelley and
Albert Cunningham, patients in the hospital, were at that
time in a private room in the hospital adjoining ward "C,"
engaged in playing cards. The sister of charity, who was
known as Sister Mary Laurian, came to the door of this
room and called Reyburn and asked him to act as a wit-
ness to the will. She then called Kelley, and stated to him,
according to the testimony of the latter, that Dubach wanted
him to witness Jolly's will, and he repeated this to Cun-
ningham, who also came out of the room. Reyburn was
crippled and unable to walk and got about in a wheeled
chair. He wheeled his chair into the ward occupied by
Jolly and over to his bed, and Fienberg handed him the
will, already signed by the testator, and asked him, in the
presence of the testator, to sign it as a witness. He laid
the will down on the window ledge at the head of Jolly's
cot and subscribed the same as a witness. He then handed
the will to Kelley, who had come in and who signed his
name as a witness. He in turn handed it to Cunningham,

who also signed as a witness. The testator was at that time, according to the testimony, lying on his right side on the cot and writing on a tablet a request to the railroad company by which he had been employed, for transportation for his deceased wife's remains to the place of burial.

As to the mental competency of the deceased, it appears from the evidence that during the first month or six weeks he was in the hospital he had at different times been taken out riding and to the home of appellee. He had expressed to different persons his intention of making substantially the provisions that he made in his will in case his wife died before he did. It also appears that he had written a request that if his wife died before he did, the twenty acres of land which he owned in the State of Arkansas should go to Nathan A. Marshall, to whom it was given by the will, and that he had spoken to Dubach about getting a lawyer to draw a will for him, but the latter had expressed the hope that he was not going to die and that there was no necessity for it. It also appears that up to a few weeks before his death he was able to be up and around in the hospital, visiting with other patients and playing cards with those who were afterwards witnesses to his will, and was entirely normal and competent mentally. It is true that as his disease progressed he suffered greatly, was in pain most of the time and largely under the influence of opiates, and that he was unable to talk or articulate plainly, because the disease had affected his tongue and vocal organs. He was sometimes able to make himself understood to the attendants and sometimes made known his wants by writing on a tablet. From the manner in which the will was drawn, the testator writing out what he wanted in the will and handing what he had written to Dubach, and the latter writing it in the blank form and the testator then reading it, it seems, so far as shown by the evidence, despite the testator's affliction and physical weakness and the opiates that had been administered, that he caused to be written in the

will just what he wanted, and that it was, in fact, as far as his wishes and desires went, his will and was duly signed by him.

As to the manner in which the will was witnessed the evidence is not so clear. The object of the statute in requiring that a will shall be signed by the testator or acknowledged by him to be his will in the presence of witnesses, and that said witnesses must subscribe their names as witnesses thereto in his presence, is to make it sure that the genuine will executed by the testator is the same one that is witnessed and that some other writing is not substituted in place of it. (*Calkins* v. *Calkins,* 216 Ill. 458.) There is no question of that kind in this case, and there can be no doubt from the evidence that the will which was signed by Jolly, and which had been previously written according to his directions and read over by him, was the same instrument that was signed by the subscribing witnesses as such.

As to whether the witnesses subscribed the will in the presence of the testator and at his request the evidence is not the most satisfactory that they did so, but under the circumstances of the case we think the contention of appellants is more technical than real. The testator was unable by word of mouth to request anyone to sign the will as a witness, but it sufficiently appears that someone in his presence and at his bedside did send the sister of charity who was in charge of the ward for witnesses to the will and that she complied with that request. She also informed two of these witnesses, and one of them informed the other, what was wanted of them. The inference is very clear from the evidence that Jolly wanted to make a will, that he wanted it written, wanted to execute it and have its execution witnessed. The request for these witnesses was made in his presence and at his desire, and under the circumstances of this case it was the same as if the testator had personally requested the witnesses to act as such. In

*Craig* v. *Trotter*, 252 Ill. 228, it was held that it was not necessary that a testator by his own words acknowledge his signature or request the attestation of the witnesses, and if persons are brought to him by a third party with a statement in his presence that they have been brought for the purpose of witnessing his will, and he then executes the will, which is signed by them as witnesses in his presence, his assent may be inferred unless there is other evidence leading to a different conclusion. In this case, pursuant to his request these witnesses came to the bedside of the testator, and in his immediate presence the first one, Reyburn, was handed the will by Fienberg and he was requested to witness the will. All this was in the presence and hearing of the testator and must have been with his knowledge and approbation. The other two witnesses came in right after Reyburn and also signed the will as witnesses. Reyburn started to leave the testator's presence before Kelley and Cunningham signed, but the two latter signed as witnesses in the presence of each other. The will is partly printed and partly written, and the entire will, the signature of the testator, the attestation clause and the signatures of the subscribing witnesses are on one side of a single sheet of paper. Each witness had it in his hands and looked at it before subscribing his name as a witness thereto. It is not questioned that they saw the signature of the testator, which is just above the attestation clause, and understood that it was his will that they were signing as witnesses. The attestation clause regularly recites that the will was on the date thereof signed, published and declared by the testator, G. W. Jolly, to be his last will and testament in the presence of the witnesses, who at his request have subscribed their names as witnesses thereto in his presence and in the presence of each other.

In *O'Brien* v. *Estate of Rhembe*, 269 Ill. 592, we held that where a will contains a full and formal attestation clause and the signature to the will is shown to be in the

handwriting of the testatrix, and the subscribing witnesses went at the request of the testatrix to witness her will and signed as witnesses a paper they understood was the will, the fact that they did not remember seeing the testatrix sign the will or that she acknowledged it to be her act and deed does not preclude the probate of the will. To the same effect are *Thompson* v. *Owen,* 174 Ill. 229, and *Gould* v. *Chicago Theological Seminary,* 189 id. 282. Of course, a will, to be valid under the statute, must, among other things, be signed by the testator in the presence of the sub-scribing witnesses or he must acknowledge it to be his act and deed. An attestation clause in due form signed by the witnesses is entitled to weight, according to all the authorities, even though the witnesses forget the circumstances or the facts set out in the attestation clause or subsequently testify differently. *In re Estate of Kohley,* 200 Ill. 189.

We think, under the circumstances of this case, there was a sufficient acknowledgment by the testator that the instrument in question was his will. As to whether the will was witnessed in the presence of the testator, as a matter of fact the witnesses were in his immediate presence, within a few feet. They were at the head of his cot, which was an iron hospital bed, with the head to the west and near a window. The cot occupied by the testator was open, with rods at the head, and there was no curtain or screen or anything on that side to obstruct his view of the witnesses. The question to be determined is whether the witnesses were in his presence, so that he knew what they were doing. In *Calkins* v. *Calkins, supra,* on page 464 of the opinion it is said: "The authorities have always given to the word 'presence' the meaning of conscious presence, so that the act of attestation may be within the actual personal knowledge of the testator, and in *Witt* v. *Gardiner,* 158 Ill. 176, it was stated that the test of presence of the testator is contiguity, with an uninterrupted view between the testator and the subscribing witnesses, as the indispensable ele-

ment to the physical signing in the testator's presence. It is not necessary that the act of attestation be performed in the same room, if it takes place within the testator's range of vision where he can see the signing, considering his position and the state of his health at the time. It is still in his presence although he may turn and look away or choose not to look at the act. On the other hand, no mere contiguity of the witnesses will constitute presence if the position of the testator is such that he cannot possibly see them sign. An attestation is not in the presence of the testator, although the witnesses are in the same room and close to him, if some material obstacle prevents him from knowing of his own knowledge or perceiving by his senses the act of attestation. The rule so stated was re-affirmed in *Drury* v. *Connell,* 177 Ill. 43." In *Witt* v. *Gardiner,* 158 Ill. 176, it is said on page 181 of the opinion: "What constitutes the 'presence' of a testator or testatrix, within the meaning of the statute, has been made the subject of much discussion by the courts, but the rule supported by the weight of authority may be stated substantially in the language of a distinguished modern law writer, as follows: Contiguity, with an uninterrupted view between testator and subscribing witnesses, is the indispensable element to the physical signing in the testator's presence. The subscription is not invalidated by not having been performed in the same room, or even in the same house, provided it took place within the testator's range of vision, as in case where witnesses left the testator, who lay in bed in one room, and subscribed their names at a table in another room opposite and in sight through a passage, the doors being thrown open; or where a lobby intervened, but the testator might have seen the subscription made in a gallery through the lobby and a broken glass window; or where the testatrix sat in her carriage, and the will was attested in the attorney's office but not out of her sight. In all such cases the attestation is held good, on the theory that the testator

might at least have seen the signing, considering his position and the state of his health at the time of the transaction; and it is deemed immaterial that he did not see when he might have done so, for the act, being done in his presence, could not have been vitiated by his turning and looking away. On the other hand, no mere contiguity to the witnesses will constitute a 'presence' with the act if the testator's position be such that he cannot possibly see them sign, as where, for instance, he occupies his bed chamber and the witnesses subscribe in an outer hall, where they are necessarily hidden from sight by an intervening flight of stairs, or where his position, which he cannot readily change, is such that the witnesses are in reality out of sight."

The judge who tried the case in the circuit court had the advantage of seeing the witnesses and hearing them testify, which advantage we do not possess.

On consideration of the entire evidence in the record we are unable to say that the judgment of the circuit court admitting the will to probate was wrong, and it will be affirmed.

*Judgment affirmed.*